CAMBRIDGEPORT SAVINGS BANK *vs.* DAVID BOERSNER &
another.[1]

Suffolk. April 9, 1992. - August 14, 1992.

Present: WILKINS, ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Practice, Civil,* Judgment notwithstanding verdict, Counterclaim and
cross-claim, Waiver. *Contract,* What constitutes, Modification. *Waiver.*

At the trial of an action arising out of a written agreement between the
    plaintiff bank and defendants who had executed a written guaranty to
    secure payment in the event of a default on the bank's loan to a realty
    trust of which the defendants were the trustees, the defendants' evi-
    dence on their counterclaim for breach of contract was insufficient to
    warrant an inference, "based on probabilities rather than possibilities,"
    that the parties had reached a subsequent oral agreement to modify
    their written contract so as to obligate the bank to disburse loan pro-
    ceeds each month in an amount sufficient to allow payment of interest.
    [439-442]
A lender's oral promise that it would fund the interest payments on a loan
    on which the borrowers subsequently defaulted was not a basis for an
    enforceable contract, where the lender's promise engendered merely a
    hope or expectation on the borrowers' part, which was not equivalent to
    either legal detriment or reliance. [442-443]
In an action arising out of a default on a construction loan in which the
    jury returned general verdicts against the plaintiff on its complaint and
    in favor of the defendants on their counterclaims, the judge correctly
    allowed the plaintiff's motion for judgment notwithstanding the ver-
    dicts. [443]
In an action for default on a loan arising out of a written agreement be-
    tween the plaintiff lender and the defendant trustees of a realty trust
    who had executed individually a written guaranty to secure payment in
    the event of a default on the loan to the trust, the judge correctly deter-
    mined that, under the terms of their guaranty, the defendants waived
    their rights to assert counterclaims alleging breach of the implied cove-
    nant of good faith and fair dealing and a violation of G. L. c. 93A.
    [443-444]

---

[1]Edgard Puente.

CIVIL ACTION commenced in the Superior Court Department on October 6, 1988.

The case was tried before *Richard S. Kelley*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Thomas S. Francis* for David Boersner.

*Alan B. Rubenstein* (*Gordon M. Orloff* with him) for the plaintiff.

*Floyd H. Anderson*, for Edgard Puente, was present but did not argue.

*Anthony M. Feeherry & Judy A. Levenson*, for Massachusetts Bankers Association, amicus curiae, submitted a brief.

GREANEY, J. The plaintiff, Cambridgeport Savings Bank, brought this action in the Superior Court to collect on a mortgage note in the amount of $2,615,095.49, plus interest, late charges and costs of collection.[2] The defendants, David Boersner and Edgard Puente, each had executed a written guaranty to secure payment in the event of a default on the loan, which had been made by the bank to Boersner and Puente as trustees of Boston Dartmouth Realty Trust.[3] The defendants denied the bank's allegation that the loan was in default, and they separately filed counterclaims alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and a violation of G. L. c. 93A.[4] A jury returned general verdicts against the bank on its com-

---

[2]We here acknowledge the amicus brief submitted by the Massachusetts Bankers Association in support of the plaintiff's position.

[3]The trust instrument of Boston Dartmouth Realty Trust provided that "[n]othing herein, and no act of any Trustee, and no instrument executed by any Trustee shall create or impose on the Trustee any personal liability." The guaranties executed by Boersner and Puente allowed the bank to proceed directly against the guarantors if the trustees defaulted on the loan.

[4]The defendants' complaints asserted other counterclaims, including a violation of the Federal Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961 et seq. (1988)], abuse of process, intentional interference with contractual and advantageous business relationships, economic duress, deceit, fraud and misrepresentation. These other claims were decided in the plaintiff's favor prior to the jury verdict or withdrawn; they are not before us on appeal.

plaint and in favor of the defendants on their counterclaims alleging breach of contract and breach of the implied covenant of good faith and fair dealing, and they awarded each defendant damages in the amount of $3 million. The judge granted the bank's motion for judgment notwithstanding the verdicts, Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974), and he entered judgment in favor of the bank on the defendants' counterclaim under c. 93A, which he had reserved for himself. The defendants appealed, and we granted their petition for direct appellate review. We affirm the judgment notwithstanding the verdict.

The loan at issue was made on December 8, 1987, as an acquisition and construction loan in the maximum amount of $4,000,000. Boersner and Puente, as trustees, had sought the loan in order to acquire the building located at 312-314 Dartmouth Street in Boston, to renovate it, and to sell it as six residential and three commercial condominium units. They purchased the Dartmouth Street building with approximately $2.5 million of the loan proceeds. The remaining $1.5 million, to be used for renovating the building, was to be disbursed by the bank in accordance with conditions set forth in a loan agreement.

The loan is evidenced by a five-page promissory note, a thirteen-page loan agreement incorporating by reference a commitment letter from the bank and containing other exhibits, and separate eleven-page guaranties, executed by Boersner and Puente individually, of all the trustees' obligations under the note. In these documents, the trustees promise "to pay to [the bank] the Original Principal Amount, or so much thereof as shall have been disbursed from time to time under the Loan Agreement, with interest," with "[p]ayments of interest only on the outstanding balance . . . payable on each Payment Date prior to the Maturity Date." The note provided that a "default in the payment of any money due . . . shall render the whole sum then remaining unpaid hereunder then due and payable at the option of the holder hereof notwithstanding the waiver of any prior breach or default." The documents also specified that the "Loan

Agreement may not be modified or amended orally but only by a written instrument signed by Borrower and Lender."

Under their guaranties, Boersner and Puente unconditionally agreed that "[n]o setoff, counterclaim, reduction or diminution of any of the Obligations, or any defense of any kind or nature, which the Borrower has or may have against the Bank, shall be available hereunder to the Guarantor against the Bank." Each guaranty also provided as follows: "The Guarantor hereby waives any and all suretyship defenses and all other defenses in the nature thereof, and agrees that enforcement of this Guaranty shall not be affected, reduced, modified or impaired by any dealing by the Bank with the Borrower or anyone else who may now or hereafter become liable in any manner for the Obligations in such manner as the Bank, in its sole discretion, may deem fit, or if, by operation of law or for any other reason, any or all of the Obligations, or any security therefor or any other guaranty thereof is invalid, defective or unenforceable, this Guaranty shall be binding upon the Guarantor to the same extent as if the Guarantor were primarily obligated for the Obligations." There then follows in each guaranty, without any limitation of the foregoing, a number of specific waivers including assent to the two provisions noted below.[5]

In October, 1988, the bank brought suit against Boersner and Puente in their individual capacities as guarantors, alleging that the note was in default because, beginning in May of that year, the trust had failed to make monthly interest

---

[5]"(ii) any renewal, extension or postponement of the time for payment or performance, or other forbearance or indulgence (regardless of the length or number thereof), waiver, acceptance of partial payment, settlement, adjustment or compromise, or addition, substitution or release of any person or party primarily or secondarily liable, with respect to the Obligations and any such security or other guaranty therefor or thereof, with respect to any obligation, covenant or agreement of any party to the Mortgage, the Documents or this Guaranty, or any extension or renewal thereof, with respect to any payment of any kind due and payable thereunder or any extension or renewal thereof;

"(iii) any action or failure to act or delay in taking action by any party under this Guaranty, the Mortgage or the Documents[.]"

payments (of approximately $24,000 per month as required by the note) on the amount of $2.5 million that had been disbursed for the acquisition of the building. Earlier, on July 5, 1988, the bank sent a letter to the defendants, notifying them that interest payments for May and June were overdue and requesting payment. No payment was made. On August 25, 1988, the bank sent a certified letter notifying the defendants as guarantors that the trustees were in default and that the bank was opting to accelerate the principal balance, and made demand upon the defendants as guarantors to pay the amount due. Boersner and Puente answered that they were not individually liable on the note as guarantors because the loan had not gone into default; they contended that the loan transaction included an agreement, not expressed anywhere in the loan documents, that the bank would disburse construction loan proceeds to the borrowers each month in an amount sufficient to allow them to meet their interest payment obligation.[6] The bank's breach of this alleged agreement also formed the basis of the defendants' counterclaim asserting breach of contract.

On the fifth day of trial, the judge ruled that the loan documents, which provided that it was the borrowers' obligation to pay interest monthly on the outstanding principal balance, constituted integrated and complete agreements. As a result, parol evidence of the agreement to the contrary alleged by the defendants could not be considered by the jury. The judge so instructed the jury in his charge: "[A]ny evidence of any oral agreements or understandings of the parties, or negotiations between the parties, prior to or at the same time as the execution of the loan documents cannot modify the written terms of those documents."[7]

---

[6]The counterclaim of defendant Edgard Puente states: "The Project Loan extended by Cambridgeport was to be of the self-funding variety which means that on a monthly basis Cambridgeport would release from the Project Loan the amount of interest earned by the bank on the loan for the previous month."

[7]The defendants, arguing that "a critical, if not the most critical, issue in this case is whether the loan was intended by the parties to be self-

Although the judge found that the loan documents consti-
tuted integrated and complete agreements, he apparently
concluded that the evidence could warrant a jury verdict in
favor of the defendants on a theory that the parties had en-
tered into a subsequent oral agreement, enforceable by its
terms, to modify the contract to provide for interest funding
by the bank, or on a theory that the bank had made a subse-
quent promise to fund interest, on which the defendants had
justifiably relied. Over the bank's objections, the judge in-
structed the jury on the law relating to oral modification of a
written contract and the law relating to the enforceability of
a promise by virtue of reliance.[8] As noted above, the jury

---

funding as to monthly interest payments," requested a reconsideration of
the judge's ruling. Their motion for reconsideration was denied.

On appeal, the defendants do not dispute the judge's ruling that the loan
documents constituted an integrated agreement. Their position is that
"[i]n light of the judge's proper decision to submit the issue of oral modifi-
cation to the jury and the favorable verdict, [this] ruling was harmless
error." Although the issue is not before us on appeal, we note that the
question of integration is one of fact reserved for the trial judge, whose
resolution of that issue will not be reversed unless clearly erroneous.
*Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 849-851 (1973).
*Wang Laboratories, Inc.* v. *Docktor Pet Centers, Inc.*, 12 Mass. App. Ct.
213, 219-220 (1981). Restatement (Second) of Contracts § 209(2) (1981).
We perceive no such error in the judge's decision of the issue.

[8]On the theory of oral modification, the judge instructed the jury as fol-
lows: "Although the parties may have entered into a written agreement as
to certain elements of a particular transaction, the parties may subse-
quently also enter into oral agreements which vary, modify, eliminate or
create additional obligations from those set forth in the written docu-
ments." The reliance theory was explained by the judge in this way:
"Now, there's been some argument that — some evidence presented that
the bank, once having permitted a drawing down or funding of an applica-
tion of the funds to the payment of interest, was required to continue it.
The demand by the bank for monthly interest payments from a source
other than the undisbursed principal balance of the loan may constitute a
breach of contract based upon the theory of estoppel. In order to find that
the bank was estopped from demanding such monthly interest payments,
you must find the following: That a representation was made to the Plain-
tiff-in-counterclaim to the effect that the monthly interest payments due to
the bank would be drawn from the undisbursed principal balance of the
loan; that the representation was made to the Plaintiff-in-counterclaim
with the intent that he would rely upon it; that the Plaintiff-in-counter-
claim relied upon this representation, and as a result, did not make ar-

returned verdicts in the defendants' favor on both the plaintiff's claim and the defendants' counterclaims, and the judge granted the bank's motion for judgment notwithstanding the verdict.[9]

In considering a motion for judgment notwithstanding the verdict, "the judge's task, 'taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.' " *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985), quoting *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983). The court will consider whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn" in favor of the non-moving party. *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). "The inferences to be drawn from the evidence must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture." *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 706-707 n.3 (1990), quoting *McNamara* v. *Honeyman*, 406 Mass. 43, 45-46 (1989).

---

rangements to pay the interest and that the Plaintiff-in-counterclaim suffered a detriment when the bank demanded interest payments . . .' "

[9]During trial, Cambridgeport moved for a directed verdict as a prerequisite to filing its motion for judgment notwithstanding the verdict. Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974).

The judge's decision to instruct the jury on the issues of subsequent oral modification and reliance may have been made in compliance with the recommended procedure in a case presenting a close question whether the standard for granting a directed verdict is met. In such circumstances, the judge should allow the matter to go to the jury, and then rule upon the issues presented, if it becomes necessary, in the context of a motion for judgment notwithstanding the verdict. See *Feltch* v. *General Rental Co.*, 383 Mass. 603, 611-612 (1981); *Smith* v. *Ariens Co.*, 375 Mass. 620, 627 (1978); *Soares* v. *Lakeville Baseball Camp, Inc.*, 369 Mass. 974, 975 (1976).

1. *Theory of subsequent oral modification.* It is a settled principle of law that "[t]he mode of performance required by a written contract may be varied by a subsequent oral agreement based upon a valid consideration." *Siegel* v. *Knott,* 316 Mass. 526, 528 (1944). *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 625 (1985). *Wesley* v. *Marsman,* 393 Mass. 1003, 1004 (1984). *Schinkel* v. *Maxi-Holding, Inc.,* 30 Mass. App. Ct. 41, 47 (1991). Additionally, a provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract. "Mutual agreement on modification of the requirement of a writing may . . . 'be inferred from the conduct of the parties and from the attendant circumstances' of the instant case." *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank, supra* at 625, quoting *Flynn* v. *Wallace,* 359 Mass. 711, 715 (1971).

In *First Pa. Mortgage Trust, supra,* joint venturers had entered into a written participation agreement to share in financing the construction of a rental apartment project. The agreement required written consent to modification. Approximately eighteen months after entering the written agreement, the judge found, the parties entered into an oral agreement to lend additional money to the project. We concluded that "ample evidence" supported the judge's finding that such an agreement had been reached. That evidence, which included numerous discussions between the parties and written communications setting forth the details of the new agreement and directing that the appropriate legal documentation be prepared, was sufficient for the judge to have found that the party denying the existence of a modification had instead "unequivocally" expressed his approval "of the many pertinent details" of the new agreement. *Id.* at 622-623.[10]

---

[10]The evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties. Other jurisdictions have required the proponent of an alleged oral modification to prove that the terms of the written agreement were altered by the oral agreement by more than a simple preponderance

By contrast, the evidence here does not permit an inference that the parties had reached an oral agreement to modify the written contract. Significantly, the defendants did not assert that a subsequent agreement had been negotiated; instead, they testified that the bank's obligation to fund the monthly interest payments was a term of the original agreement. David Boersner testified that when he received the first bill for monthly interest, he called bank employee Christine Anderson to inquire what to do with the bill because he "assumed that the interest was taken care of," suggesting that he believed that the loan agreement had always provided for interest disbursements from the remaining loan principal. Similarly, Edgard Puente testified that the terms of the original loan negotiations included $800,000 for "soft costs," fifty-five per cent of which was for interest. The defendants' contention would appear to be that the issue of interest funding, not formally resolved at the time of the loan closing, was the subject of the oral agreement later made between the parties.[11] Their argument appears to reflect a continuing erroneous belief that the same evidence of a contemporaneous agreement that was excluded under the parol evidence rule could prove their theory of subsequent oral modification.[12]

---

of the evidence. See, e.g., *EDO Corp.* v. *Beech Aircraft Corp.*, 911 F.2d 1447, 1454 (10th Cir. 1990) (interpreting Kansas law to require "clear and convincing evidence," and holding that "[e]vidence of vague, indefinite, or ambiguous statements will not suffice"); *Nicolella* v. *Palmer*, 432 Pa. 502, 508 (1968) (requiring "clear, precise, and convincing evidence").

[11]That this was the defendants' principal theory is further indicated by offers of proof made by their counsel after the judge had ruled that evidence tending to vary the unambiguous terms of the loan documents was excluded. The offers of proof were to the effect that two of the defendants' witnesses, J. Edward McHugh, the commercial loan officer who negotiated the loan for the bank, and William Koski, the attorney who drafted the loan documents, would have testified that they understood the loan to provide for interest payments from the loan principal. (McHugh did testify that he recalled no discussion after the loan closing with either defendant concerning the interest payments.)

[12]This argument in essence is an indirect appeal of the judge's finding that the loan documents constituted an integrated agreement under which the borrowers were obligated to pay interest, see note 7, *supra*. The defendants, pointing to the statement in the judge's memorandum and order

The remaining evidence offered by the defendants is insufficient to support their theory. The defendants rely primarily on the fact that for the first four months after the loan closing, the bank had paid the monthly interest payments from the remaining loan principal. Christine Anderson, a bank employee, testified that at the direction of Mr. McHugh, the bank's commercial loan officer who had negotiated the loan, she established the procedure for these interest payments to be made by the bank and informed the borrowers that after receiving the monthly interest bill, they should send it back to the bank, after which the monthly interest payment would be disbursed from the loan proceeds. However, she also testified that she had no lending authority and that she obtained the approval of Mr. McHugh before any disbursement was made to cover an interest payment. A document concerning the status of the loan that was prepared in May, 1988, by Lynne Coyle, a bank loan officer, includes an item in its calculations for the bank's payment of monthly interest; Coyle testified that she drafted the document as an attempt to gauge the amount of money the bank might receive from a proposed sale of two condominium units in the building and to outline a proposal made by the borrowers to satisfy a possible shortfall in those proceeds. Interim budgets submitted by the borrowers included amounts for interest, as required by the bank's commitment letter.

What we have here are carefully drawn and comprehensive loan documents which squarely committed Boersner and Puente as full guarantors of the obligations owed by their trust to the plaintiff. The provisions in the guaranties, which integrate closely with the terms of the note and the provisions of the loan agreement, allowed the bank to make accommodations and grant indulgences to the borrowers. Overall, the instruments create a strong barrier against a claim of

that the agreement was "silent as to the method by which interest payments were to be made," argue that the judge's finding of integration does not include that item. We disagree. In ruling on the defendants' motion for reconsideration of his finding, the judge stated that "the note clearly indicated . . . that [the borrower] has an obligation to pay interest monthly."

subsequent modification. That barrier cannot be penetrated by a weak claim such as the one presented by Boersner and Puente.. We conclude that their evidence, taken in sum, is insufficient to warrant an inference "based on probabilities rather than possibilities," *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 706-707 (1990), that the interest disbursements made by the bank were the result of a post-closing agreement to modify the loan documents.

2. *Theory of enforceability based on reliance.* The defendants argue in the alternative that because they relied upon the bank's promise to fund interest, that promise is an enforceable contract. See *Loranger Construction Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 761 (1978); Restatement (Second) of Contracts § 90 (1981).[13] We disagree. Because the borrowers had assumed the obligation to pay interest monthly as a term of the loan agreement, the bank need not have had reason to expect that they would reasonably rely on any subsequent promise by the bank to fund those payments from the loan principal. Furthermore, the actions undertaken by the defendants in supposed reliance on the bank's promise to fund interest payments — incurring expenses for salaries and advertising to market the condominium project — were not induced by the bank's promise to fund interest payments; the defendants were already obligated by the terms of the written agreement to sell the condominium units. The bank's promise that the bank would fund the interest payments, therefore, was merely a hope or expectation on the defendants' part, which "is not equivalent to either legal detriment

---

[13]Restatement (Second) of Contracts § 90 (1) (1981) provides in relevant part: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." The rule stated by § 90 requires that "the promisee must actually rely on the promise," and "the reliance must have been induced by the promise." E.A. Farnsworth, Contracts § 2.19 at 95-96 (1982). See also *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 357 (1985).

or reliance." *Congregation Kadimah Toras-Moshe* v. *DeLeo*, 405 Mass. 365, 366-367 (1989).

We conclude that the jury verdict in favor of the defendants must have been "the result of mere speculation and conjecture," see *McNamara* v. *Honeyman*, 406 Mass. 43, 45-46 (1989), and we affirm the allowance of the bank's motion for judgment notwithstanding the verdict.[14] Our decision on the merits of the bank's complaint also disposes of the defendants' counterclaim asserting breach of contract.

As to the defendants' two remaining counterclaims alleging breach of the implied covenant of good faith and fair dealing and a violation of G. L. c. 93A, we agree with the judge's determination that under the terms of their guaranties, the defendants waived their rights to assert these counterclaims.[15] See *Federal Deposit Ins. Corp.* v. *Hill*, 13 Mass. App. Ct. 514, 518 (1982). The judge did not abuse his dis-

---

[14]In entering judgment notwithstanding the verdict on the bank's claim, the judge ruled that, although the jury could reasonably have inferred an oral modification of the written loan agreement to provide for interest funding by Cambridgeport, the loan agreement "imposed specific conditions on Cambridgeport's obligation to disburse any monies to the borrowers," and because those conditions had not been met, the "undisputed evidence showed that Cambridgeport's obligation to disburse funds had not arisen, due to the failure of the defendants to meet numerous pre-disbursement conditions." Because we conclude that there was no evidence from which a subsequent oral modification could be inferred (assuming that the jury found for the defendants on that theory), we necessarily disagree with the factual basis of the judge's decision. However, if any valid basis exists for the allowance of a motion for judgment notwithstanding the verdict, the allowance will be affirmed even if the trial judge based his decision on erroneous grounds. *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 572 (1986).

[15]On appeal, the bank argues that the waiver clause of the guaranties, which provides that defenses as well as counterclaims available to the borrowers are not available to the guarantors ("No setoff, counterclaim reduction or diminution of any of the Obligations, or any defense of any kind of nature, which the Borrower has or may have against the Bank, shall be available hereunder to the Guarantor against the Bank") should also apply to deny to the defendants their primary defense that the loan had not gone into default. Because the condition of default was a prerequisite to the guarantors' obligations, the judge's decision to allow this issue to be litigated was proper.

cretion in denying the defendants' motion to add themselves, as trustees, as plaintiffs-in-counterclaim.

In view of our disposition of the case, we need not rule on the propriety of the judge's allowance of the plaintiff's motion for a new trial, Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974).

*Judgment affirmed.*