Donald C. HUTCHINS, Plaintiff

v.

ZOLL MEDICAL CORPORATION,
Defendant.

C.A. No. 04–30121–MAP.

United States District Court,
D. Massachusetts.

May 11, 2006.

Donald C. Hutchins, Longmeadow, MA, Pro Se.

Jordan M. Singer, Goodwin Procter LLP, Boston, MA, for Defendant.

*MEMORANDUM REGARDING PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND OTHER MISCELLANEOUS RELIEF*

(Dkt. Nos. 14, 20, 32, 39, 48, 54, 55, & 57)

PONSOR, District Judge.

## I. INTRODUCTION

*Pro se* Plaintiff Donald C. Hutchins contends that Defendant Zoll Medical Corporation ("Zoll") has: (1) infringed his patent on an electronic device for cardiopulmonary resuscitation ("CPR") training; (2) infringed his copyright on a list of digitized words used in CPR prompting; (3) infringed his copyright on software designed to illustrate the timing and quantity of compressions for those administering CPR; and (4) breached a contract between the parties. Defendant denies Plaintiff's infringement allegations and claims it complied with the terms of the parties' only agreement, which simply allowed Defendant's patent counsel—a partner at the same firm as Plaintiff's patent counsel—to review Plaintiff's patents on Defendant's behalf.

On February 22, 2006, the court heard argument on the following motions: Plaintiff's Motion for Summary Judgment; Defendant's Motion for Summary Judgment; Plaintiff's Motion to Schedule a *Markman* Hearing; Defendant's Motion to Strike the

Affidavit of Robert W. Jeffway; and Plaintiff's Motion to Schedule a Jury Trial. Shortly thereafter, Plaintiff moved to amend his complaint and to compel discovery, and Defendant filed a motion to strike Plaintiff's post-hearing brief, or in the alternative, offered a response to same.

On March 29, 2006, the court: (1) denied Plaintiff's Motion for Summary Judgment (Dkt. No. 14); (2) allowed Defendant's Motion for Summary Judgment (Dkt. No. 20); (3) denied Plaintiff's Motion to Schedule a *Markman* Hearing (Dkt. No. 32); (4) denied, as moot, Defendant's Motion to Strike the Jeffway Affidavit (Dkt. No. 39); (5) denied Plaintiff's Motion to Schedule a Jury Trial (Dkt. No. 48); (6) denied Plaintiff's Motion to Amend his Complaint (Dkt. No. 54); (7) denied Plaintiff's Motion to Compel Discovery (Dkt. No. 57), and (8) denied, as moot, Defendant's Motion to Strike Plaintiff's Post-Hearing Brief (Dkt. No. 55).

This memorandum will set forth the reasons supporting these rulings.

## II. FACTUAL AND PROCEDURAL BACKGROUND

■■■ The court will begin by addressing Defendant's Motion for Summary Judgment; the facts below therefore appear in the light most favorable to the Plaintiff.[1] *See Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir.1996) (noting courts must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." (citation omitted)); *accord Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed.Cir.2001) (citation omitted), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002).[2]

### A. The Patent and Copyrights in Suit.

Plaintiff owns U.S. Patent No. 5,913,685 (filed June 24, 1996) (issued June 22, 1999) ("the '685 patent"), which discloses an electronic device "to provide guidance to rescue personnel trained in CPR for resuscitating a victim under an emergency condition." '685 patent, col.9 ll.46–48. Each claim of the '685 patent requires a "general purpose computer," *see, e.g., id.* at col.10 l.40, and an "interactive display input," *see, e.g., id.* at col.10 l.49. Since CPR procedures can differ depending upon the condition or traits of the victim, the purpose of the latter feature is to permit a user to enter into the device the "characteristics of said victim relevant to proper performance of CPR." *Id.* at col.9 ll.52–57.

Plaintiff also holds two copyright registrations relevant to this litigation. U.S.

---

1. Creating a factual summary has been complicated by several deficiencies in Plaintiff's pleadings. For one thing, Plaintiff's memorandum controverting Defendant's Local Rule 56.1 Statement of Undisputed facts (Dkt. No. 26) lacks any "page references to affidavits, depositions and other documentation." Local Rule 56.1. In addition, Plaintiff's own statement of undisputed material facts is largely devoid of such references as well. (*See* Dkt. No. 15, Pl.'s Mem. Supp. Mot. Summ. J. 2–4.)

Mindful that *pro se* filings in the First Circuit are held to "a less stringent procedural standard than others," *Nunnally v. MacCausland,* 996 F.2d 1, 6 n. 8 (1st Cir.1993) (cita-

tion omitted), the court has incorporated documentation submitted but not cited by Plaintiff. *But see F.D.I.C. v. Anchor Props.,* 13 F.3d 27, 31 (1st Cir.1994) (finding civil litigant's *pro* se status did not absolve him of obligation to comply with district court's procedural rules).

2. Under its "courtesy rule," the Federal Circuit is "generally guided by the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law." *Amana Refrigeration, Inc. v. Quadlux, Inc.,* 172 F.3d 852, 856 (Fed.Cir.1999) (internal quotation marks and citations omitted).

Copyright No. TX–u–210–208 is entitled "Script & Word List" and was registered by Plaintiff on September 13, 1985. It consists of a series of different digitized words, or "scripts," based on factors such as the characteristics of the victim and the number of on-site rescue personnel. (Dkt. No. 21, Def.'s Statement Undisputed Facts ¶ 18 (citing Dkt. No. 23, Freeman Decl., Ex. C); Pl.'s Mem. Controverting Def.'s Statement Undisputed Facts ¶ 18 (confirming accuracy of Defendant's ¶ 18 assertions).) [3]

U.S. Copyright No. TX–u–213–859 is entitled "LC5800 series cross assembler" and was registered by Plaintiff on October 8, 1985. It applies to a computer program designed to guide individuals through CPR by illustrating the proper timing and quantity of compressions. (Dkt. No. 26, Pl.'s Opp'n Def.'s Mot. Summ. J. 8.) Both copyrights are found in a device called "CPR Prompt®"—the commercial embodiment of U.S. Patent No. 4,584,524 (filed Nov. 21, 1984), which the Patent and Trademark Office ("PTO") issued to Plaintiff on April 22, 1986. (*Id.* at 7.)

## B. *The Accused Device.*

Defendant's AED Plus is a portable automatic external defibrillator that guides a rescuer through a resuscitation sequence that may include defibrillation and/or CPR. The defibrillator monitors the rhythm of a victim's heart and determines whether an electric shock is necessary to return the heart to its normal rhythm. (Freeman Decl. ¶ 4.) If a shock is required, the AED Plus charges the defibrillator and audibly instructs the rescuer to administer the shock by pressing a button. (*Id.* at ¶ 5.)

After a shock has been delivered, the device continues to monitor the victim's heart and indicates whether additional defibrillation and/or CPR should be performed. (*Id.*) If the victim requires CPR, the AED Plus analyzes the depth and frequency of chest compressions and provides an audible beep to assist rescuers in performing compressions at the prescribed rate. (*Id.* at ¶ 4.)

Defendant's device retains certain data associated with a rescue, such as when defibrillation shocks were delivered. This data is automatically deleted the next time the AED Plus is used, unless it has been transferred to a personal computer or personal digit assistant ("PDA") running a special program called RescueNet. (*Id.* at ¶ 6.)

## C. *Communications between the Parties.*

On April 16, 2003, after reading a magazine article that described the accused device, Plaintiff wrote a letter to Richard Packer, the President of Zoll. (*See* Dkt. No. 1, Ex. F, Letter from Donald C. Hutchins to Richard Packer (April 16, 2003).) Noting that the "*AED Plus* carries many of the features found in the Claims of [the '685 patent]," Plaintiff suggested that the parties "discuss the possibilities of Zoll licensing this Patent for use with AED's." (*Id.*)

Packer responded to Plaintiff's letter by telephone on May 5, 2003 and explained Defendant's position that its device did not infringe the '685 patent because it used a dedicated microprocessor rather than a general purpose computer. (Dkt. No. 1, Ex. N, June 21, 2004 Hutchins Aff. ¶ 13.) Plaintiff replied that "it was commonly

---

3. Plaintiff disputes thirteen of Defendant's thirty-one statements of purportedly undisputed facts and maintains that "[m]any others ... can only be accepted with clarification."

(Pl.'s Opp'n Def.'s Mot. Summ. J. 3.) The only facts furnished by Defendant found in this summary are those that Plaintiff has not disputed.

known that a microprocessor is a computer on a chip." (*Id.*)

On August 11, 2003, Gary Freeman, Defendant's Vice President of Clinic Affairs, sent Plaintiff an e-mail asking if he would be interested in "further discussions regarding licensing of [Plaintiff's] CPR Prompt patents." (Dkt. No. 15, Ex. F, E-mail from Gary Freeman to Donald C. Hutchins (Aug. 11, 2003).) In a letter dated that same day, Plaintiff expressed his willingness to discuss "the licensing of [the '685 patent] for use with ZOLL's *AED Plus,*" but suggested expanding the discussion to permit Plaintiff to explain how the '685 patent could "furnish both hardware and software-code protection to ZOLL for automatic methods of capturing [rescue data]." (Dkt. No. 1, Ex. I, Letter from Donald C. Hutchins to Gary Freeman (Aug. 11, 2003).)

During an August 20, 2003 meeting at Defendant's headquarters, the parties learned that Defendant's patent counsel was a partner at the same firm as Plaintiff's patent counsel. According to Plaintiff, he agreed to enter a Consent Agreement to allow Defendant's counsel to review his patents "based on the wording of the Consent Agreement that specified that the purpose of the review was Zoll's desire to license the '685 patent." (Pl.'s Mem. Controverting Def.'s Statement Undisputed Facts ¶ 28.)

In September 2003, the parties executed a Consent Agreement that began by expressing the parties' interest "in exploring the possibility of an agreement in which [Defendant] would acquire rights under one or more patents or patent applications owned by [Plaintiff]." (Dkt. No. 1, Ex. K, Agreement.) In signing the agreement, Plaintiff acknowledged that "the evaluation and advice provided to ZOLL may possibly be directly contrary to his interests." (*Id.*)

On September 24, 2003, Freeman sent Plaintiff an e-mail indicating that its patent counsel was set to commence an evaluation of Plaintiff's patents, which Freeman estimated would "take as long as a month or so." (Dkt. No. 1, Ex. L., E-mail from Gary Freeman to Donald C. Hutchins (Sept. 24, 2003).) "At that point," Freeman wrote, "we can discuss in detail all the patent and business issues." (*Id.*)

According to Plaintiff, "Freeman never communicated results of the evaluation by [Defendant's patent counsel] as he had agreed to do." (Pl.'s Mem. Controverting Def.'s Statement Undisputed Facts ¶ 30.)

### D. The Travel of the Case.

On June 22, 2004, Plaintiff filed a six-count complaint alleging "Copyright Infringement" (Count I), "Breach of Contract" (Count II), "Patent Infringement by Means of Sales" (Count III), "Patent Infringement by Means of Manufacture" (Count IV), "Patent Infringement by Means of Computer Program" (Count V), and "Patent Infringement by Means of Computer Network, Output, Transmission, Record Keeping, and Storage" (Count VI).

After Defendant tendered an answer, the parties submitted claims construction memoranda. Rather than propose a formal construction of any claim term in the '685 patent, Plaintiff chose to provide a narrative of how he came to procure this patent and its predecessors. (*See generally* Dkt. No. 8, Pl.'s Claim Construction Mem.) In contrast, Defendant proposed definitions for each term it saw as a potential source of dispute.

The first claim element for which Defendant offered a definition was "general purpose computer." As previously mentioned, this term is present in each claim of the '685 patent. According to Defendant, "a general purpose computer"

means a computer capable of running multiple unrelated programs, which are selected by the user and loaded into the device. It must feature at least: (1) a central processing unit, (2) one or more input devices that are not specific to any one program, (3) memory, (4) mass storage devices (such as a disk drive) for storing large amounts of data, and (5) one or more output devices.

(Dkt. No. 10, Def.'s Claims Construction Chart 1.)

The second term at issue for which Defendant offered a definition is "interactive display input." Defendant proposed that this term means

a device for communicating with a computer which allows a user to respond to options presented by the computer by selecting from a menu displayed on a display screen.

(*Id.* at 2–3.)

Finally, Defendant submitted that the phrase "characteristics of said victim relevant to proper performance of CPR techniques" means

the following specific traits or qualities of the victim: (1) whether the victim is an adult, baby, or child; (2) whether the victim requires mouth-to-mouth resuscitation; and (3) whether a choking victim is conscious or unconscious.

In an effort to "simplify areas of disagreement," Plaintiff filed an affidavit on March 25, 2005, in which he stated:

I can agree with the definitions held by [Defendant] in [Defendant's] claim construction and appendix.... I believe that [Defendant's] claim construction and definitions support my Complaint of patent infringement....

(Dkt. No. 12, Ex. A, Hutchins Aff. ¶¶ 6–7, Mar. 25, 2005; *see also* Dkt. No. 43, Pl.'s Clarification Brief 2 ("Hutchins can agree and litigate to the dictionary terms pre-

sented in Zoll's claim construction as filed."); Dkt. No. 53, Pl.'s Brief Controverting Def.'s Feb. 22, 2006 Arguments 2 (Defendant's definition of "[general purpose computer] fits Hutchins concept of a general-purpose computer.").)

### III. CROSS MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In cases where both parties have moved for summary judgment, the basic summary judgment framework remains intact. *De Jesus–Rentas v. Baxter Pharm. Servs. Corp.*, 400 F.3d 72, 74 (1st Cir.2005) (citation omitted). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir.2002) (citation omitted).

While the court must alternately draw all reasonable inferences in each nonmovant's favor, each nonmovant "must respond to a properly supported motion with sufficient evidence to allow a reasonable jury to find in its favor 'with respect to each issue on which [it] has the burden of proof.'" *Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc.*, 405 F.3d 36, 39 (1st Cir.2005) (citing *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997)); *see also Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002) (an alleged factual dispute must be capable of affecting the suit's outcome to withstand an otherwise properly supported motion for summary judgment) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A. *Defendant's Motion for Summary Judgment.*

### 1. *Count I: Copyright Infringement.*

 Proof of copyright infringement requires a plaintiff to show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir.2005) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)).[4] In this case, Defendant concedes Plaintiff's ownership of valid copyrights. The question thus becomes whether Plaintiff can prove that Defendant copied original aspects of his work.

 To prove illicit copying a plaintiff must first demonstrate that copying, "as a factual matter," actually took place. *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir.1995), *aff'd*, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996), *rehr'g denied*, 516 U.S. 1167, 116 S.Ct. 1062, 134 L.Ed.2d 206 (1996). Since "[p]lagiarists rarely work in the open," *Johnson*, 409 F.3d at 18, a court may infer that there was "factual copying" if "the alleged infringer had access to the copyrighted work" and there is "probative similarity" between "the offending and copyrighted works," *Lotus Dev.*, 49 F.3d at 813 (citations omitted). "[T]wo works are probatively similar if . . . any similarities . . . , in the normal course of events, would not be expected to arise independently. . . ." *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 370 (5th Cir. 2004) (citation omitted).

 Once a plaintiff shows probative similarity, he must then establish that "the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.' " *Segrets, Inc. v. Gillman Knitwear Co., Inc.*, 207 F.3d 56, 60 (1st Cir.2000) (citation omitted), *cert. denied*, 531 U.S. 827, 121 S.Ct. 76, 148 L.Ed.2d 39 (2000); *see also Johnson*, 409 F.3d at 18 (finding substantial similarity in cases where an "ordinary observer" would conclude that the defendant "unlawfully appropriated the plaintiff's protectable expression" (citations omitted)).

 In assessing an allegation of factual copying, a court must dissect the copyrighted work "by separating its original, protected expressive elements from those aspects that are not copyrightable because they represent unprotected ideas or unoriginal expressions." *Johnson*, 409 F.3d at 19. Examples of unprotected ideas or unoriginal expressions include "fragmentary words and phrases" and "forms of expression dictated solely at functional considerations." *CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1519 (1st Cir.1996) (citations omitted); *see also id.* at 1520 (stating that such materials fail to evince the requisite quantum of creativity).

 In addition, under the doctrine of merger, copyright protection is unwarranted "[w]hen there is essentially only one way to express an idea." *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 36 (1st Cir.2001) (citation omitted). In such cases, "the idea and its expression are inseparable and copyright is no bar to copying that expression." *Id.* (noting that where the merger doctrine applies, plaintiffs bear "the heavy burden"

---

**4.** While the Federal Circuit "has jurisdiction over . . . claims for patent, as well as copyright, infringement," it "applies copyright law as interpreted by the regional circuits, in this case . . . for the [First] Circuit." *Amini Inno-* *vation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1368 (Fed.Cir.2006) (citing 28 U.S.C. §§ 1292, 1295, 1338 (2005); *Atari Games v. Nintendo of Am.*, 897 F.2d 1572, 1575 (Fed. Cir.1990)).

of establishing "near identity" of the works at issue).

■ In this case, Plaintiff bases his first copyright infringement claim on Defendant's use of "27 phrases" allegedly found in his "Script & Word List." Significantly, Plaintiff has not specified a single offending phrase, and a comparison of the voice prompts in question indicates that only two are identical—"Check breathing" and "Call for help"—and only three are remotely similar—"Stay Calm" ("Remain Calm"), "If no pulse, start CPR" ("If no pulse, continue"), and "Give two breathes" ("Start With Two Breaths"). (*Compare* Dkt. No. 23, Ex. C., AED Plus Administrator's Guide 15–16, *with* Dkt. No. 23, Ex. D, Copyright No. Txu–210–208, "Script & Word List".)

■ Assuming *arguendo* that these five phrases could render the works probatively similar, such "copying" does not constitute copyright infringement. As the *Johnson* court made clear, "copyright law protects original expressions of ideas but it does not safeguard either the ideas themselves or *banal expressions of them.*" 409 F.3d at 19 (citing *Feist,* 499 U.S. at 345–51, 111 S.Ct. 1282) (emphasis added). Here, the information contained in Plaintiff's five short phrases is entirely functional. Indeed, the Script & Word List phrases contain "no stylistic flourishes or any other forms of creative expression that somehow transcend the functional core of the directions." *Nat'l Nonwovens, Inc. v. Consumer Prods. Enters., Inc.,* 397 F.Supp.2d 245, 256 (D.Mass.2005) (citation omitted).

■ Furthermore, because Plaintiff's phrases communicate ideas that require, "if not only one form of expression, at best only a limited number ... the subject matter would be appropriated by permitting the copyrighting of [their] expression." *John G. Danielson, Inc. v. Win-*

*chester–Conant Props.,* 322 F.3d 26, 43 (1st Cir.2003) (quoting *Morrissey v. Procter & Gamble Co.,* 379 F.2d 675, 678–79 (1st Cir.1967)). Rather than allow copyright law to become "a game of chess in which the public can be checkmated," *id.,* the court must conclude that the doctrine of merger forecloses Plaintiff's first infringement allegation.

■ In support of his second copyright infringement claim, Plaintiff asserts that "the CPR section structure of the computer program that controls the AED Plus compares exactly with the timing and quantity of compressions used in the Copyright No. Txu–213–859 program." (Pl.'s Opp'n Def.'s Mot. Summ. J. 8.; *see also* Pl.'s Mem. Controverting Def.'s Undisputed Facts ¶¶ 22, 23 (noting that "both the LC5800 [series cross assembler] and AED Plus require[ ] a program to produce 100 compressions per minute and to output this sound as an audible sound to the rescuer").)

This argument suffers from the simple fact that the basic protocol for CPR, including the timing and quantity of compressions, was developed by the American Heart Association long before Plaintiff entered the field of CPR prompting. (*See* Dkt. No. 36, Pl.'s Mem. Controverting Def.'s Reply Supp. Mot. Summ. J. 8 (acknowledging that the algorithms of the LC5800 cross series assembler "are designed to produce the standard for repetitive phrases, timing and rate *as taught by the American Heart Association.*") (emphasis added); Pl.'s Mem. Controverting Def.'s Undisputed Facts ¶ 20 ("Hutchins agrees that CPR was developed in 1960 and the basic protocol for CPR has not changed since 1960.").) Plaintiff's subsequent incorporation of this protocol in his device does not entitle him to prevent others from doing the same. *See Grubb v. KMS Patriots, L.P.,* 88 F.3d 1, 6 (1st

Cir.1996) ("[T]wo works may be identical in every detail, but, if . . . both works were copied from a common source in the public domain, then there is no infringement." (citation omitted)).

Moreover, even if Plaintiff had invented CPR, the Copyright Act clearly does not afford protection for processes or procedures. 17 U.S.C. § 102(b) (2006). In short, Plaintiff's software copyright claim is based upon uncopyrightable subject matter.

### 2. *Count II: Breach of Contract.*

In his complaint, Plaintiff alleges that Defendant breached a "verbal contract to negotiate in good faith" as well as a "written contract . . . to expedite a final license." (Dkt. No. 1, Compl. ¶ 38.) At other points of this litigation, Plaintiff has also suggested that Defendant violated a contractual obligation by failing to communicate the results of its patent counsel's work. (*See* Pl.'s Mem. Controverting Def.'s Undisputed Facts ¶ 30.) Construing Plaintiff's pleadings liberally, the court will address each of these theories in turn.

First, Plaintiff submits that the parties' e-mail exchanges, phone calls, meeting, and Consent Agreement would be "understood by business persons to be a contract between the parties to negotiate in good faith." Unfortunately for Plaintiff, the law is well-settled that the essential terms of a contract must be definite enough to ascertain the nature and extent of the parties' obligations. *Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F.Supp. 404, 417 (D.Mass.1995) (citing *Simons v. Am. Dry Ginger Ale Co.*, 335 Mass. 521, 523, 140 N.E.2d 649 (1957)). Having failed to identify the terms of this alleged contract, Plaintiff cannot rely on the court to fill in the blanks. While an obligation of "good faith and fair dealing is implicit in the performance of a contract,

even if not stated," this "principle presupposes the formation of a contract" and is therefore inapplicable during "the courtship dance phase of contract formation." *Schwanbeck v. Fed.-Mogul Corp.*, 31 Mass. App.Ct. 390, 396 n. 6, 578 N.E.2d 789 (1991) (citations omitted), *overruled on other grounds by* 412 Mass. 703, 592 N.E.2d 1289 (1992); *see also Bell v. B.F. Goodrich Co.*, 359 Mass. 763, 763, 270 N.E.2d 926 (1971) (finding oral agreement to negotiate does not create binding contract).

Plaintiff's next contention that Defendant breached a written contract to expedite a final license agreement is at odds with the plain language of the Consent Agreement, the parties' only written agreement. Simply put, nothing in this document compels either party to work towards or enter into a license agreement. Instead, the Consent Agreement merely indicates a mutual interest "in exploring the possibility of a[ ] [license] agreement."

Finally, there is Freeman's unfulfilled promise in a September 24, 2003 e-mail to contact Plaintiff once Defendant's patent counsel completed his analysis of Plaintiff's patent. The suggestion that the court should regard the performance of this promise as a duty founders upon the well-established principle that, absent circumstances inapplicable here, enforceable contracts require consideration. *Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 201 (1st Cir.2004) (applying Massachusetts law). In other words, "the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." *Id.* (citation omitted).

In this case, it is clear that Plaintiff neither provided anything, nor refrained from doing anything, in exchange for the Defendant's pledge to keep him "up to

date" with the work of its patent attorney. While Defendant could, and perhaps should, have informed Plaintiff when it decided not to license his patent, it is also clear that Defendant would not have received a corresponding benefit if it had done so. In short, because Freeman's promise was gratuitous, the alleged contract "committing Zoll to continued discussions" is unenforceable for lack of consideration. *See Congregation Kadimah Toras–Moshe v. DeLeo,* 405 Mass. 365, 366, 540 N.E.2d 691 (1989).

### 3. *Counts III–VI: Patent Infringement.*

▉▉▉▉ To determine whether a patent has been infringed, a court must first interpret the patent's claims to ascertain their scope and meaning, then compare the properly construed claims to the accused device. *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC,* 403 F.3d 1364, 1367–68 (Fed.Cir.2005) (citing *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir. 1998) (en banc)). Ultimately, to establish infringement, a patentee must demonstrate that "the accused device meets each claim limitation, either literally or under the doctrine of equivalents." *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263, 1273 (Fed.Cir.2004) (citations omitted).[5]

▉▉▉ Since the parties have already agreed upon "the dictionary definitions for the terms of Patent No. 5,913,685 as presented by Zoll's claim construction" (Pl.'s Clarification Brief 2), the court must now compare the claims at issue with the features of Defendant's device. As previously noted, for the purposes of this litigation, "a general purpose computer"

means a computer capable of running multiple unrelated programs, which are selected by the user and loaded into the device. It must feature at least: (1) a central processing unit, (2) one or more input devices that are not specific to any one program, (3) memory, (4) mass storage devices (such as a disk drive) for storing large amounts of data, and (5) one or more output devices.

Although Plaintiff contends that this definition describes the Hitachi SuperH RISC engine # Sh08 that drives the AED Plus, this clearly is not the case. For example, notwithstanding Plaintiff's argument that the factory *could* design the accused device to run "multiple unrelated programs,"[6] the fact is it has been designed to run only one.

▉▉▉ It is a bedrock principle of patent law that proving literal infringement requires a patentee to show that "the accused device *contains* every limitation in the asserted claims." *Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211 (Fed.Cir.1998) (emphasis added) ("If even one limitation is missing or not met as claimed, there is no literal infringement." (citations omitted)). The fact that an accused device could contain a missing limitation if programmed differently is irrelevant.

It is equally clear that Plaintiff cannot overcome the agreed upon mass storage requirement by observing that Defendant's *RescueNet* software permits the AED Plus

---

5. Because Plaintiff has not presented any argument concerning infringement under the doctrine of equivalents, that issue has been waived. *Boss Control, Inc. v. Bombardier Inc.,* 410 F.3d 1372, 1380 (Fed.Cir.2005).

6. (*See* Dkt. No. 15, Ex. D, SuperH, Inc. Handheld Applications (noting the use of SuperH architecture in mobile phones, digital cameras, portable electronic analyzers, and wearable computers); *see also* Dkt. No. 38, Ex. 1, Jeffway Aff. 2–3 (describing various applications of SuperH technology).)

to connect to an altogether different computer. (*See* Pl.'s Mem. Controverting Def.'s Statement Undisputed Facts ¶ 11 ("The AED Plus is configured with an IrDA Port capable of ... using Zoll's *Rescue Net* network software to store AED Plus rescue data on the largest external disk drives or network server hard drives.").) Unlike the '685 patent's "general purpose computer," which "provide[s] guidance ... for resuscitating a victim *under an emergency condition*," col.9 ll.46–48 (emphasis added), a general purpose computer can only be used in conjunction with Defendant's device to store rescue date *after* an emergency condition.

Finally, the undisputed facts also show that Defendant's device does not employ an interactive display input, *i.e.*, "a device for communicating with a computer which allows a user to respond to options presented by the computer by selecting from a menu displayed on a display screen." As previously noted, the purpose of this feature is allow rescue personnel to inform the device of the "characteristics of [the] victim relevant to proper performance of CPR techniques." *See, e.g.*, col.9 ll.52–57.

Plaintiff notes the accused device's ability to analyze a victim's heart rhythm and suggests that this is proof of its sensitivity to a victim's "characteristics." Unfortunately for Plaintiff, this argument overlooks the parties agreed upon definition of that term, which is limited to factors such as the age and consciousness of the victim. Since it is undisputed that the AED Plus does not consider these sorts of attributes, a reasonable jury could not conclude that every limitation recited in these claims is present in the AED Plus. *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1163–64 (Fed.Cir.2004) (citation omitted).

Defendant's Motion for Summary Judgment with respect to Counts Three through Six was therefore allowed.

### B. *Plaintiff's Motion for Summary Judgment.*

Having allowed Defendant's Motion for Summary Judgment, the court naturally denied Plaintiff's motion for the same.

## IV. MOTIONS FOR OTHER MISCELLANEOUS RELIEF

### A. *Plaintiff's Motion for a Markman Hearing.*

Since there was no dispute concerning the proper dictionary definition of the terms at issue, the court determined that there was no need for a *Markman* hearing and thus denied Plaintiff's motion. *See PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1357 (Fed.Cir. 2004) (affirming district court's decision not to hold *Markman* hearing in case where meaning of claim terms was not disputed).

### B. *Defendant's Motion to Strike the Jeffway Affidavit.*

Because the court's consideration of the Jeffway affidavit caused Defendant no prejudice, the court denied Defendant's motion that it be struck.

### C. *Plaintiff's Motion to Schedule a Jury Trial.*

The court denied this motion in light of its determination that there were no proper issues to be submitted to a jury.

### D. *Plaintiff's Motion to Amend his Complaint.*

 Plaintiff seeks to amend his complaint by adding allegations concerning the allegedly infringing sales of Defendant's AED Pro Defibrillator. Although this product was first introduced in April 2005—two months before Plaintiff moved for summary judgment—Plaintiff did not

file his motion to amend until March 6, 2006.

The Federal Rules of Civil Procedure provide that after a responsive pleading is served, a plaintiff may amend his complaint "by leave of court ... and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Ordinarily, "the leave sought should, as the rules require, be 'freely given.' " *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, if a party moves to amend after the close of discovery and motions for summary judgment have been docketed, "the proposed amendment must be not only theoretically viable but also solidly grounded in the record [and] ... supported by substantial evidence." *Watson v. Deaconess Waltham Hosp.,* 298 F.3d 102, 109 (1st Cir.2002) (quoting *Hatch v. Dep't for Children, Youth & Their Families,* 274 F.3d 12, 19 (1st Cir.2001)).

In this case, Plaintiff's allegations are neither grounded in the record nor supported by substantial evidence. In fact, Plaintiff never even mentioned the AED Pro's existence until six days after the February 22, 2006 motion hearing. (*See* Pl.'s Brief Controverting Def.'s Feb. 22, 2006 Arguments 3 ("Recently Zoll added AEDPRO to its rapidly growing family of infringing devices.").)

Because discovery would have to be reopened in order for Zoll to defend itself adequately against the claims set forth in the amended complaint, the allowance of Plaintiff's motion would result in considerable prejudice. *Cf. Grant v. News Group Boston, Inc.,* 55 F.3d 1, 5–6 (1st Cir.1995) (finding prejudice in case where non-moving party had not yet completed its motion for summary judgment). In addition, in light of Plaintiff's failure to offer an explanation for the late hour of his motion, it would be improper to permit such "undue delay." *See States Res. Corp. v. The Architectural Team, Inc.,* 433 F.3d 73, 83 (1st Cir.2005) (citing "undue delay" among the adequate reasons for denying a motion to amend (citation omitted)).

### E. *Plaintiff's Motion to Compel Discovery.*

Plaintiff seeks an order compelling Defendant to produce the AED Plus that it brought to the motion hearing on February 22, 2006. Because this device was not a part of Defendant's presentation and played no part in the outcome of the case, the court denied Plaintiff's motion.

### F. *Defendant's Motion to Strike Plaintiff's Post–Hearing Brief*

Because the court's consideration of Plaintiff's Post–Hearing Brief caused Defendant no prejudice, the court denied Defendant's motion that it be struck.

## V. CONCLUSION

For the reasons stated above, on March 29, 2006, this court: (1) denied Plaintiff's Motion for Summary Judgment (Dkt. No. 14); (2) allowed Defendant's Motion for Summary Judgment (Dkt. No. 20); (3) denied Plaintiff's Motion to Schedule a *Markman* Hearing (Dkt. No. 32); (4) denied, as moot, Defendant's Motion to Strike the Jeffway Affidavit (Dkt. No. 39); (5) denied Plaintiff's Motion to Schedule a Jury Trial (Dkt. No. 48); (6) denied Plaintiff's Motion to Amend his Complaint (Dkt. No. 54); (7) denied Plaintiff's Motion to Compel Discovery (Dkt. No. 57), and (8) denied, as moot, Defendant's Motion to Strike Plaintiff's Post–Hearing Brief (Dkt. No. 55).

The clerk is ordered to enter judgment for Defendant on all counts. This case may now be closed.

It is So Ordered.